Next case is Paske v. Fitzgerald, and we hear first from Ms. Harris. Good morning. May it please the Court. Misuse of public funds is a very serious matter, and there can be no doubt that the serious matter such as this is of concern to the public. The public relies on individuals to be diligent, to seek it out, and when they find it, to speak out. And that is what Sergeant Paske did. He learned on July 19th, 18th, that Captain Merritt had violated the city policy, had lied about needing funeral leave, had not left to go to the funeral. She was found at home hiding behind her mother, who lied to these two officers twice and said she had left home. Do you have to go to the funeral, or can you just have bereavement time off? Well, the language of the funeral leave policy in the record, it's 1682. It is called funeral leave. We have to assume, of course, that when they drafted this, they knew what words they were using, and it says how long you can take off. Normally, a one- to three-day absence should be sufficient, depending upon individual circumstances, such as the location of the funeral. Now, Assistant Chief Bereson said, hey, don't that mean you have to go to the funeral? Chief Fitzgerald said he certainly took it that way, that she had to go to the funeral. Dr. Williams, the head of human resources, said yes. This is the city's policy. He said, yes, you do have to go to the funeral. Now, instead of even investigating what Captain Merritt had done, they re-read this policy and found this little out. It's like, well, it doesn't absolutely insist that you go to the funeral. And the wording in here about taking into consideration where the funeral is, Assistant Chief Jemison decided, was just irrelevant. We can just ignore that part of the policy. Don't you think he was complaining as a fellow officer as part of his job? No, Your Honor. His job was a patrol sergeant. His job was to get these eight or nine people on the street watching for crime, protecting the community. But she was above him in rank at this point. She was. She was the captain over the CID. He was a different division. He was a patrol sergeant. That is true. What happens, though, is that right as soon as he complains, first he goes to Assistant Chief Jemison and says, she lied. She broke the policy. Are you going to do anything about it? And Assistant Chief Jemison said, it's none of your business. I don't want to hear about it. That's not enough to get an assurance that this person is going to suffer any consequences. She misused public monies. She lied to get paid time off when she didn't go to a funeral. They didn't even investigate what she did. They just accepted that, oh, well, we're getting right to this policy, and she's gone. So he speaks out again the next day, July 20th. And this was in a supervisor's meeting where the chief asked for questions. Well, everybody wanted to know why she seemed to be getting away with this again. That is the language of another officer. And so in response to, floor is open for questions, Sergeant Paskey asked a question. He wanted to know whether all that was going to happen was Captain Merritt was being demoted and Lieutenant Harris was being promoted. The chief immediately showed his anger, his face turned red, and he changed the subject. The best defense is a good offense. He started criticizing Sergeant Paskey for something entirely unrelated. The very next day after he asked that question, he's suspended. A week later, he's demoted. Three weeks after that, he's fired. All of this within days of bringing this issue up before the assistant chief and before the chief. It was also the business about taking the drug test, wasn't it? Yes, Your Honor, and I did want to address that straight away. What you see in the record is nobody, nobody except for Mr. Helfand, believes that Sergeant Paskey was abusing drugs. The city has a policy. It says if you have a reasonable suspicion that somebody's using drugs, we're going to drug test. The police department doesn't even have to go through the procedures of the city. It can order a drug test at any time. Did he have a history of using drugs? No, Your Honor, he did not. Chief Fitzgerald said he had no reasonable suspicion that, I guess it was then, Officer Paskey was using drugs. Assistant Chief Jemison said the same thing. Sorry. Well, it doesn't really matter what they thought. I mean, the EAP person had said he complained about being moody or something and having lost 50 pounds, and therefore she said he might have started taking drugs. Actually, that started with Assistant Chief Bereson telling EAP, oh, he's discourteous, he's got rage, he's got all these anger management problems. So the administrative person asked Chief Bereson, does the city drug test? Because we want to rule out, make sure he's not got this anger problem because of drugs. Then what you see in the record is that forever after that, after she asks, it's the city pursuing it. The city wants it done. Chief Fitzgerald calls and he's mad that it hasn't been done yet. They say they want a hair and urine test. That's what the city says. Nobody has seen him as a therapist and said he needs to be drug tested. In fact, when the administrator called the therapist and said, well, they're thinking that maybe he should be drug tested, the therapist said, I don't see that. I'm not going to recommend that. I've had this meeting with him. He was calm. So your argument is that the whole drug test issue was a pretext for him to be called into the office while his mother-in-law was in the hospital. Is that what you're saying? I'm saying that it was a pretext. They certainly couldn't have known in advance that there was going to be a family emergency. Apparently Officer Paskey says he knew when he said that there was a family emergency and he couldn't believe that he was going to be fired. They were certainly convinced that that's what Chief Fitzgerald had in mind all along. But what's also important is that they say that with an investigation, because they assume there would be an investigation, that nobody in that investigation would conclude that it was reasonable to fire him when he had a family emergency. He had children and all. But he did go through the civil service procedures, right? He grieved first his demotion, and then he filed a grievance on the termination. My partner, as you will see in the record, because her letter to the city got admitted into the record, and she tells the city, there's this problem with what happened. There's this problem with what happened. Here's the people he can talk to. Well, how many months later? Four-plus months later, here we get this multiple-page letter written by the city manager that just parrots whatever else had been told to him from Fitzgerald and Jemison. And we couldn't get that letter in electronic format to see who wrote it, because the city complained or said it was protected by the attorney-client privilege. They wrote it, or they had a substantial hand in it. Judge Johnson would not . . . I'm sorry. Our magistrate judge is blanking on that. She, in fact, looked at it, and she said, yes, we don't get the metadata to see who wrote it because it's protected by attorney-client privilege. That is clearly not something that reflects any kind of independent analysis. They say, well, he considered all the evidence. Officer Paskey could have submitted more. We submitted a letter. He already had a letter that went through all the details. He could have followed up on any of those, the city manager Mueller. He could have asked evidence about that. The letter also says to the city manager, we're happy to sit down with you. And they wouldn't do it unless Officer Paskey went in by his own, and it was his understanding that the city attorney was going to be present. Well, we would be violating our duties of professional responsibility if we allow our client to go into a meeting with the opposing counsel, and we're not even there. But that was the condition. So, no, he didn't go. It had already been four-plus months. Chief Fitzgerald is totally clear. He made the decision. He made the decision on the day that Officer Paskey told him he had a fire emergency, his mother-in-law hit by a car, he had to go home. There's six children here. They've never been left alone. The oldest is... They were left with a neighbor. Well, they were panicked, and they had a stopgap, yes, because he had to go to the EAP. He couldn't reach the therapist to tell her what was going on, and they said, okay, we're desperate. Debbie, who lived right there, said, I'll take the infants. There were two infants, four older children, not, I mean, maximum age 12. She took the two infants, but the parents were very concerned about that because she had two adult developmentally challenged children that she had to care for. They had an unfenced, unprotected pool. And these babies, these infants, they're old enough to get around. Well, you know, all that goes to a fact issue on causation, I suppose. But the big issue to me is whether this was speech on a matter of public concern or internal to the police force. And it is not internal to the police force. This is about misuse of public funds. Well, I mean, how granular are you going to make that kind of complaint? Because you could say that they saw her daughter or somebody driving around in the police car. So every time somebody uses a police car on an errand, is that a misuse of public funds? I suppose technically it might be, but that is not the basis of the complaint in this case. The complaint is she lied, said she was going to a funeral. She got paid leave. She was caught lying. That is definitely a misuse of public funds. And that is something everybody in the department is wondering, how is she getting away with this? Why? I mean, finally, they think, finally somebody is going to discipline her. Now, unfortunately, when she was demoted, was her pay scale lowered? A little bit. A little bit, yes. Sergeant Paskey lost $700 a month. So his pay loss was significant, particularly when law enforcement officers are just not paid. I was asking you about her. Right, yes. She did. She lost some amount of money, not a large amount of money. She also was curious, as they say, that she voluntarily demoted herself and nobody ever asked her why. Nobody ever asked her about this funeral leave. She had already told them, it's like, I'm hoping to leave Wednesday morning because the funeral is Friday. Nobody asked her a darn question about that. Assistant Chief Bereson, in fact, said, well, you know, we've got to have morality in how we operate here, and it would just be inappropriate to ask her when she's had a death in the family to ask her, you know, whether she intended to go to that funeral. So what's your best case for saying this would be speech on a matter of public concern? All of the cases that this Fifth Circuit has decided on police misconduct. Everybody needs to know when there has been police misconduct, and that is what he spoke out about. The issue about tolling is what arises when you read the district court's opinion, and there's this focus on, oh, there's all these complaints that have been made about her, and there's no mention that Mr. Paske, the officer, is not the only one. Chief Bereson thought she was unqualified. David Avra, who worked under her. He's not the one on trial. No. The point is, though, that in the district court opinion, it seems to be convoluted, and they're carrying together as though what he was complaining about, that what we're saying protected speech is, is a whole host of things. Those other things are background information, not what the protected speech is. And I see I'm out of time. Good morning. Good morning. May it please the Court. Counsel William Helfand on behalf of the appellees, the city and Chief Fitzgerald. Let me say at the outset that I agree with opposing counsel that misuse of public funds is a serious matter, but misuse of public funds really doesn't factor into this case in any way, shape, or form. And even if it did, to answer Judge Jones' question toward the end of appellate counsel's argument, his report of what he claims now was misuse of public funds would have been speech directly within the ambit of his responsibilities as a police officer. I should point out at the outset that throughout his argument, both at the trial court and here, Mr. Paske jumps to an assumption that there is a relationship between reporting what he claims was Chief Merritt's inappropriate recording of her time and the adverse employment actions of which he complains, yet he offers no evidence of any link between those two things, other than that they both occurred. Against that backdrop, he makes that argument, despite being stopped as a matter of law, from asserting that his firing was for any reason other than his direct and admitted insubordination, because at page 1159, I beg your pardon? Insubordination was the speech or because he didn't go to the drug test? Because he didn't go to the drug test. Because he defied, by his own admission, a direct and lawful order of his supervisor, as found by the state administrative judge and not appealed by Mr. Paske. Mr. Paske had a two-day hearing, called all the witnesses that he chose, contested that his firing was the result of direct insubordination, yet testified in that hearing that he acknowledged being insubordinate. And there is a judicial finding which has become final. It is in the record, page 1159, beginning at page 1159, in which the administrative law judge has expressly found that Mr. Paske's firing was due solely and only to his insubordination. So we have that. This is a case of shooting the messenger, though. I beg your pardon, Your Honor? Isn't this a case of shooting the messenger? I'm not sure I understand the court's question. Well, because he was the only one who was bold enough to speak up in the meeting, he may have done it in an insubordinate way, which is sanctionable, but he was the only one who bothered to speak up in the meeting and say, how does she get away with this? Well, assuming that to be the case, and that actually is not what he said in a meeting, what he said in a meeting was one statement that was considered to be racially insensitive. I understand that. And another, which was simply... It sounds, yeah, well... Well, it certainly begs the question of the purpose of that statement. That's fine. But the other statement was, why hasn't something happened to her, or words to that effect, right? Not in the CompStat meeting, Your Honor. In the CompStat meeting that preceded his demotion, Mr. Paske's egregious acts, according to his fellow officers, were, one, raising the question of injecting the term about the Klan into the discussion and referring to two supervising officers as her and him rather than by their rank and displaying what uniformly every officer in the room reported to be insubordinate. I understand that. You're not answering. He did make a comment related to Captain Merritt, did he not? I don't believe that he did in the CompStat meeting, Your Honor. Not at all? Not regarding the issue of her overtime, regarding the issue of her demotion. Okay. But even if he did or he were perceived to have been continuing to complain of that, his firing was not for what he said in the CompStat meeting. I understand that. And so my point was simply he is bound. There's certainly a circumstantial case here where a jury, given his long history of good service, where a jury might find that the decision was made to terminate him and then to find the grounds to do it. But that's not . . . The problem is there's no evidence that would support that judge and it would be directly inopposite of a judicial finding with which he's now . . . Well, that's not the main basis of Judge Werlein's ruling anyway, is it? No, I agree, and I want to move to that if I may, and that is that Judge Werlein does an excellent job of a thorough analysis of his own that comports with the same findings made by the administrative law judge. Now, again, I believe that under 28 U.S.C. . . . I want to find the exact reference here. It's in the briefing. I believe that under 28 U.S.C. 1738, Judge Werlein was required to adopt for purposes of issue and claim preclusion the findings of the state administrative law judge, but I have no quarrel with the fact that he didn't in light of a very thorough analysis of his own in which he again observed that . . . and I think it would answer your question, Judge Jones, that I don't think Judge Werlein found, and I don't think the evidence supports with all due respect, even a circumstantial case of some inference of a relationship between an idea of wanting to fire the gentleman and then finding grounds to do so, and for this very reason. It concerns me, and I think might support that inference, and that is the sanction of discharge seems very severe given the alleged violation. I mean, if he did have . . . I assume the facts show that his mother-in-law was injured in an accident. I'm sorry, Your Honor? Did the facts show that his mother-in-law was indeed injured in an accident and that his excuse for not going immediately to have the drug test was validated, and in spite of that he was discharged? Those that were investigated, Judge, let me speak to those. First of all, remember his mother was in the hospital when he left to go to the EAP appointment, so he already felt comfortable enough that he could go to the EAP appointment. His mother-in-law was being cared for by others. There were four people at the hospital, including his wife, the lady's daughter, caring for her at the hospital. So he already left knowing that she was being cared for. Number two, he admitted, and the chief reported, part of the city manager's investigation, that he did not say he could not go to the department to take the drug test. He said he would not go to the police department to take the drug test, and you have in the record that after he got home he wrote a sarcastic e-mail to the chief questioning why he needed to take a drug test, not asserting that he had some impediment to taking the drug test. He already told the chief that. He told the chief he had to take care of his kids, right? He told the chief that he had to take care of his kids. The chief responded, again, your kids were taken care of when you left to do the EAP. Well, you know, to me that just raises a fact issue, given the age of the children and the surrounding circumstances. Well, respectfully, Judge, I don't see how it raises a fact issue. Why don't you try to win on the easiest issue, which is whether this is a matter of public concern, or do you have doubts about that issue? No, I do want to get to that, Judge. I just want to be sure I answer the Court's questions. However, I fully understand your point, and I do want to be sure I answer the Court's questions. And there are a couple of other easier issues here I would respectfully submit. And to your point, Judge, Mr. Paske's speech was not public speech, and anything that might have been public speech, I guess he now contends, would have been the report regarding Captain Merritt's use of time off. Now, that's not public speech for several reasons, and I think my opposing counsel erred when she represented that it was not part, in response to Judge Clement's question, not part of his job. In fact, at 334-84 through 334-86, and as the District Court recited the deposition testimony in Judge Werlein's opinion, Mr. Paske said he reported that because it was his business as a sergeant in the Department. So, like Mr. Garcetti, Mr. Paske's report, to the extent that it even related to a matter of public concern, was consistent with his responsibilities of his job. And the record demonstrates, at pages 1204 and 5, at 1211 and 12, and at 1352 and 53, that unlike any other officer in the Department, Mr. Paske's job was to review and approve overtime timesheets, vacation timesheets, like the one he complained about. Even for a captain? Even for a captain, Your Honor. He had an administrative responsibility for reviewing all of the timesheets and reporting to his supervisor any discrepancies. Lastly, I would point out that the record demonstrates that the policies of the Police Department require that all officers make an internal report of any violation of departmental rules. So to the extent that Ms. Harris points out that this may have been a departmental rule violation, Mr. Paske was required by policy as an officer to report it internally. It's notable that Mr. Paske's only reports are internal because in Gibson v. Kilpatrick, recently on remand from the Supreme Court back in December, this Court took up the question of the distinction of whether Lane modified the courts holding in Gibson that Mr. Gibson's reports were within the course of his responsibilities as the Chief of Police and found that notwithstanding anything in Lane, that Lane had not changed that in any respect. I should point out that Gibson is a case of misuse of public funds. What were the facts in Gibson? I remember the case came out. I don't remember the facts. Yes, Your Honor. In Gibson, Mayor Kilpatrick had opposed Mr. Gibson being appointed as the Chief. Shortly after Mr. Gibson was appointed as the Chief, he observed what he believed to be Mayor Kilpatrick using a city credit card for personal gas. He reported that to a number of agencies, including the DEA and the FBI, which did investigations. And the office, there's a state office, it's the OSA, and I forget what that stands for, but the Mississippi State Office found that Mayor Kilpatrick had in fact charged $3,000 worth of gas to the city that was really appropriately for personal use and therefore not appropriate for the city to pay and ordered the mayor to repay that. This court found on remand from the Supreme Court after Lane had been decided for reconsideration in light of Lane that all of that was within the ambit of his responsibilities as a police officer and administrator for the city. Now, this court said that the reports to the FBI and DEA being outside of the normal scope of the reporting of a police officer in Mississippi raised some question as to whether it may have been more outside of his ordinary responsibilities, but ultimately the court found that even those reports were within his ordinary responsibilities. Whether it's because of the departmental policies or because of his responsibility to review and approve and track vacation and overtime, clearly Mr. Paskey had a responsibility and was following his responsibility. And as I point out, as Judge Borlein observed at pages 3384 through 3386, I'm sorry, 3386 of the record, Mr. Paskey testified that it was his business to make this report. Well, you're not saying that the Connick-Meyers balancing or the Pickering-Connick balancing depends on what the plaintiff says as opposed to what the court says, are you? Right. Well, in fact— This is the second time you've referred to that, so— Well, I'm not saying that, Judge, and of course you're correct to say that that's a question of law to be decided by the court, but the statement of the plaintiff's purpose in making the report clearly has some role in resolving that issue. I would say—I would accept to say, and maybe this answers your question, even if Mr. Paskey protested that this was a matter of public citizen outcry, the court could find otherwise. I just don't rate that very highly because obviously we require police officers to know the Fourth and the Fifth Amendments. We don't require them to know the First Amendment. And that's true, and I'm going to come to that in just a moment, Judge, but in this case— You're pleading for qualified immunity for Fitzgerald, right? We did plead qualified immunity, and I'm going to— You can't make your argument that Paskey should have known what he—how he should decorate his— No, no, I'm not, Judge, and I don't mean to make that argument. I apologize if I'm not being clear. I'm not arguing that— I'm just playing with you. I know that, Judge. I should say I hope that that's the case. I don't mean to suggest that Mr. Paskey's characterization of his report is the issue for the court. The court decides that as a matter of law, and I think if you decide consistent with the court's prior precedent, in a number of cases which are cited in the brief, not the least of which is Gibson, that the court will find that this was speech consistent with Garcetti that was joined upon Mr. Paskey as a matter of his responsibilities. The reason given for the termination was failing to take the—refusing to take the drug test, right? Yes, Your Honor. Does that relate in any way to whether Garcetti's speech occurred or not? I think not, Your Honor, and Judge Worlein observed that Mr. Paskey offers no evidence of any connection between the two, and so I don't think so either, but Mr. Paskey continues to argue that, but yet he will point the court to no record evidence that anyone contends that there's any relationship between those two things or that there's even any reason to infer that. So, no, but— I mean, the opposing counsel suggested that there was a reasonable suspicion standard the city had before they ordered a drug test. Did the police commander have the authority to order a drug test without any evidence of suspicion? Yes. The chief has the authority without—the chief has the authority under the city's policy if there is reasonable suspicion to believe that there's a need for a drug test. That reasonable suspicion came from independent people, that is the two EAP folks from UT Health, and to that—in that respect, I just want to answer Judge Jones' question earlier where you said perhaps the idea here was to get rid of the man. I would point out that that would require the complicity of two independent health care providers who have testified that the idea for a drug test was their own and that they specifically requested that the department conduct one. Well, what was the necessity for it to be done immediately? That struck me as strange. He did have a—arguably had an excuse for not running down to the medical center immediately. Well, he didn't have an excuse, Judge, to say he would not take the test. He didn't say that. He said he—but maybe I'm misremembering the record. The chief said come down here in an hour, and he said I can't or I won't. No, Judge, you are misremembering the record. He told Assistant Chief Jemison that his mother-in-law was in the hospital. Chief Fitzpatrick called—Fitzgerald, excuse me, called him, told him to come. He said he would not. But it doesn't matter because obviously Fitzgerald knew what the circumstances were by that time. Fitzgerald knew that—again, Fitzgerald knew that he had left earlier, knowing his mother-in-law was in the hospital, to go to his EAP appointment. Fitzgerald knew that he could come by the department. I would offer as well that with all due respect to the questions, the issue is not whether it was reasonable to ask him to take a drug test. They asked him to take a drug test, and he had signed—Judge Davis, this is back to your point. He had signed a personal improvement plan that said he would not violate another order or directive or policy of the department, and if he did, he would be fired. Now, he testifies, and it's throughout the record, but it's particularly laid out in page 14 of the appellee's brief, that he called his wife and considered coming to do the drug test, that after the two of them spoke, he knew that if he refused, he would likely be fired, and the moment that he told the chief that he would not come to take the drug test, he knew he would be fired. So he— Nobody said, can you take the drug test tomorrow? No one ever said that. The answer to the question for the urgency is the potential for interfering with the accuracy of the drug test. But he talked to the EAP people about scheduling it later date, had he not? I don't know of anything in the record of— I thought that was in the briefs. Maybe I'm misremembering again, but I thought it was in the briefs that they had said, you need to take a drug test, and he said, well, we've had this family emergency. Can I reschedule it? I don't recall that. There are a number of things in the brief, Judge, that aren't supported—in the appellant's brief that are not supported by the record. Let me, if I could, during the last few seconds that I have, point out that there are other grounds for affirmance that we haven't spoken about and which Judge Wehrlein didn't find it necessary to reach, but were briefed and therefore support the summary judgment. That is the Pickering balance test as well, and that is that there's ample evidence consistent with this Court's opinion in Nixon v. Houston that the Pickering balance test comes down on the side of the Chief's decision here. But also, and Judge Jones, you asked this question, there's absolutely no law or evidence in the record that would sustain Mr. Paskey's burden to overcome the presumption of Chief Fitzgerald's qualified immunity. The recent decision of this Court in Gibson v. Kilpatrick, which is in some ways fairly factually analogous, demonstrates that as of January of this year, the law was clearly not established that the Chief's actions could subject him to liability under the First Amendment. And I would point out that that's consistent with Judge Jones' opinion in Noyola v. Texas Department of Human Resources— Well, that's one of the most overlooked decisions in the Fifth Circuit. —that it's rarely the case that one can make an a priori judgment that discipline or termination will violate clearly established First Amendment rights. And then as for the city, Mr. Paskey seems to have completely abandoned any effort to demonstrate what would be necessary for governmental liability and in fact offers no evidence that Mr. Mueller, who is the actual decision maker, was motivated by anything other than a belief that Mr. Paskey had, as the administrative law judge found, acted insubordinately in violation of departmental policy after being warned that having—warned that doing so would result in his firing. Thank you. Thank you, Mr. Elfin. All right. Ms. Harris, back to you. I would call the Court's attention to the EAP records. They come from a third party, not from either party here. These are independently prepared records recording the conversations. I guess the first conversation is at 1812. That's of importance. And then if I can call your attention to 1835 for the next 12, 15 pages. They lay out exactly what happened in terms of who wanted the drug test. No urgency whatsoever. If there was, they would have ordered it. The police had every opportunity to order it. And they're all falling back on saying, well, it was his provider who recommended it. No, it was not. She was asked after the first meeting, should it be drug tested, and she said, no, I don't get that feeling from him at all, but I'll consider it at the next session. Well, she was told she had to give him a letter because HR wanted it. She had to give him the letter at that second session. She already had that letter and gave it to him. She didn't base her, this was not her professional assessment. What did you say about the email that your client sent the chief after he, I guess after he got home? Yeah. I know they say it was flippant, that it was disrespectful. And I would like the court to make that assessment yourself. Well, actually, I think the jury should make that itself. You might read a copy at 2641 to 2642. He says, my time is accounted for. Fitzgerald later said, well, maybe Merritt did give him Wednesday off for EAP. He says, right after my demotion, I called English Bee and said I had a vacation. Remember, this is what they were pushing on EAP, saying, well, he's deceiving you. Well, as soon as I got assigned to Sergeant English Bee, I told him I had this vacation set up, and he said fine. Burleson and Poulton, who had been his, it's Lieutenant Burleson, Lieutenant Poulson, who had been his supervisors earlier that year, both said yes. They had approved it. All these people were there for Chief Fitzgerald to talk to. Fitzgerald didn't bother to find out at the time whether there had been an accident. He didn't bother to find out whether there was truth to he had a family emergency, had to take care of his children. The purpose of the email, complaining about the order to take the drug test, I don't understand. He is explaining that this whole issue of the vacation is not a true issue, and he's trying to point the Chief to where the proof is that he wasn't lying on the vacation, because that's what the therapist talked to him about. And you'll see in these same EAP records that she tells the administrative person, it's like, look, we need to deal with this vacation. I'm going to look at the email, but I'm asking you whether he's complaining about having to take the drug test in that email. No, no, he's not complaining about the drug test itself. He was willing to take it right then and there in the therapist's office, and she just said, no, you can't do it here. He did take it the next day when he passed, and he took the results to the Director of Human Resources, and he said, no, I don't want them. I don't want them. It's too late. You're fired. That person where you took it is not on our vendor list. And he said, well, fine, let me go to your vendor. And Dr. Williams said, no, you've already been fired. You can't go. He wanted to go when he first heard about it. He did go the next day. That's being totally ignored. In terms of his job, his job as a patrol sergeant, Mr. Helfand goes off and says his job was to review and approve time records. That was back when he worked under Captain Merritt in the CID Division, and that was why he left the division. It's because she was falsifying those records, and he said, I want out of here. He wasn't responsible for her time records in July of 2011 when all this came about. He'd been in patrol for the longest time. The Gibson case, and I know the Gibson case, that is not at all akin to Sergeant Paskey's situation. That chief of police had the responsibility of going to those agencies. Sergeant Paskey did not. His job was to be a patrol sergeant. And Lane points out, it's about your ordinary job duties. That's why Lane was clarifying Garcetti. And in Gibson, there didn't have to be any reliance on that because it was clear the chief's responsibility. I'm out of time. Thank you very much. Thank you. Thank you, counsel. We have your case.